UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
JONATHAN SMITH,                          :
                                         :
                    Petitioner-          :
                    Cross-Respondent,    :    05 Civ. 3748 (MBM)
                                         :
          -against-                      :    OPINION AND ORDER
                                         :
POSITIVE PRODUCTIONS,                    :
                                         :
                    Respondent-          :
                    Cross-Petitioner.    :
----------------------------------------X

APPEARANCES:

PETER HAVILAND, ESQ.
(Attorney for Petitioner-Cross-Respondent Jonathan Smith)
1999 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
(310) 788-1000

ALAN P. FRAADE, ESQ.
(Attorney for Respondent-Cross-Petitioner Positive Productions)
Mintz & Fraade, P.C.
488 Madison Avenue
New York, NY 10022
(212) 486-2500

MICHAEL B. MUKASEY, U.S.D.J.

Jonathan Smith, better known as the musical artist "Lil Jon," petitions to vacate, or alternatively to modify an arbitration award entered by arbitrator Mark Diamond of the International Centre for Dispute Resolution ("ICDR") in favor of Positive Productions ("Positive"), a Japanese concert promotion company, in the amount of $379,874.00, for costs and damages arising from breach of contracts wherein Smith agreed to perform three concerts in Japan. (See <u>In the Matter of the Arbitration between Positive Productions and Jonathan Smith PKA Lil John and the East Side Boys</u>, Award of Arbitrator dated December 28, 2004 ("Arbitration Award") (Ex. A to Declaration of Bruce Jacobs ("Jacobs Decl.")) Positive opposes the petition and cross-petitions to confirm the award. Both petitions have been brought pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, 10, & 11. Jurisdiction is based on diversity of citizenship. <u>See</u> 28 U.S.C. § 1332. For the reasons set forth below, the award is confirmed.

I.

The following facts are undisputed unless otherwise noted.

On January 9, 2004, Smith and Positive entered into a written agreement whereby Smith agreed to perform three concerts

1

to be promoted by Positive on March 12 and 13, 2004 in Yokohama, Japan and March 14, 2004 in Okinawa, Japan. (Ex. H to Jacobs Decl. ("January Agreement"))  It was signed by Broderick Morris of Positive and Robert Mitchell, Smith's manager. (Id. at 8)  A $35,000 advance was forwarded to Smith's agent, Ujaama Entertainment, Inc. ("Ujaama"). (Id. at 2)  The agreement contained an arbitration provision, whereby

> [a]ny claim or dispute arising out of or
> relating to [the agreement] or the breach
> thereof shall be settled by arbitration with
> the rules and regulations of the American
> Arbitration Association.  The parties hereto
> agree to be bound by the award and judgment
> upon the award rendered by the arbitrators
> may be entered in any court having
> jurisdiction thereof.

(Id. at 8)  Pursuant to the agreement, Positive rented venues, purchased airline tickets, arranged for Smith's transportation to and within Japan, reserved lodging, promoted Smith through a variety of Japanese media sources, and sold tickets to the performances.  (Positive Opp'n at 6-7; January Agreement ¶¶ 5, 8, 10)

On March 4, 2004, Smith informed Positive that he would not be able to travel to Japan and perform the shows "because he, or some of his band members, were unable to obtain passports." (Positive Answer to Petition to Vacate or, in the Alternative, Modify Arbitration Award, and Cross Petition to Confirm Arbitration Award ("Positive Answer") ¶ 6)  The shows were

cancelled and refunds paid on tickets. (Positive Opp'n at 7)
Ujaama returned the $35,000 deposit to Positive. (Id.)

     After the March performances were cancelled, the
parties negotiated and entered into another agreement, dated May
7, 2004, pursuant to which Smith agreed to perform concerts on
June 27, 2004 in Okinawa, on June 29, 2004 in Osaka, and on July
2, 2004, in Yokohama. (Ex. I to Jacobs Decl. ("May Agreement"))
The May Agreement refers to the January Agreement, providing that
"[u]pon [Smith] performing all of [his] obligations hereunder the
[January] Agreement shall be deemed void and superceded [sic] in
all respects by this [May] agreement." (Id. at 1) Again,
Positive forwarded a $35,000 deposit to Ujaama and prepared for
the shows. (Positive Opp'n at 8)

     On June 8, 2004, Positive was informed by telephone
that Smith wanted to attend the Black Entertainment Television
("BET") Awards show on June 29 in Los Angeles and preferred not
to come to Japan during the last week of June. (Id.) By letter
dated June 11, 2004, William Leibowitz, who introduced himself as
"the attorney[] for TVT Records," confirmed the development.
(Ex. C to Jacobs Decl.) In defense of Smith, Leibowitz contended
that it "is unrealistic and unfair for [Positive] to suggest that
[Smith] –- who will literally dominate the BET Awards this year
–- should refrain from attending and performing and thereby
forfeit one of the great moments in his life and career, all so

that [he] can perform in front of a few thousand people in Japan." (Id.)

On June 13, 2004, Gerald Weiner -- Positive's lawyer – stated in an e-mail to Leibowitz that "[t]o the best of [his] knowledge [Leibowitz did] not represent Jonathan Smith," that "[t]here is no contractual relationship between [Positive] and TVT Records," and that Leibowitz was "inserting [himself] into a dispute which has been ongoing since March in which [Leibowitz did] not represent any of the parties . . . ." (Ex. D to Declaration of Abid Qureshi ("Qureshi Decl.")) Five days later, Morris of Positive, in an e-mail to Weiner and Leibowitz, stated that a second "no show" in three months "would be very damaging to all." (Id.) He had learned from Erskine Isaac of Ujaama that TVT had booked a radio show for Smith in Los Angeles on July 3. He proposed that the shows be rescheduled so that Smith could perform in Yokohama on July 2 and in Okinawa on July 3, and fly thereafter to Los Angeles for the radio show. (Id.) On June 18, 2004, Leibowitz, again introducing himself as "the attorney for TVT Records," informed Positive that Smith would not appear for the scheduled June and July shows but would attempt to make himself available on later dates. (Id.) Again, refunds were given for tickets and Ujaama returned the $35,000 deposit. (Positive Opp'n at 9) To replace the cancelled shows, Positive booked on about one week's notice another American singer, Trina,

for concerts on July 2 and 3 in Yokohama and Okinawa, respectively. (Id.)

On July 8, 2004, Weiner filed a Notice of Intent to Arbitrate and a Demand for Arbitration with the American Arbitration Association and mailed copies of both to (i) Smith at his address "c/o BME Recording, 2144 Hills Ave. NW, Atlanta, Georgia 30318," and (ii) Erskine Isaac at Ujaama at "501 7th Ave. #312, New York, New York 10001." (Affidavit of Gerald B. Weiner ("Weiner Aff.") ¶ 5) Neither these letters nor any subsequent correspondence mailed or faxed to Smith or Isaac was returned as undeliverable. (Id.) Positive claimed that

> [Smith] failed and refused to travel to Japan or to appear and perform at the dates originally set forth in the [January] Agreement. Following extensive negotiations [the parties] agreed to reschedule these performance dates to June 27, 29 and July 2, 2004 and a new written agreement was entered into in that regard. [Smith] also failed to travel to Japan or perform on these reschedule dates.

(Ex. B to Jacobs Decl. (Notice of Intent to Arbitrate) at 2) Positive sought $700,000 in damages arising from "these failures." (Id.)

On July 14, 2004, ICDR sent via express mail an acknowledgment of receipt of the Demand for Arbitration, notice of a deadline to file a statement of defense by Smith, and notice of the date of an administrative conference call to Isaac at Ujaama's New York office. (Positive Opp'n at 3) Smith neither

responded to the Demand nor participated in the administrative conference call. (Id.)

An arbitration hearing was held on December 6, 2004, in New York. (Positive Opp'n at 12)  Smith did not appear. (Smith Petition to Vacate or Modify Arbitration Award ¶ 8)  Positive presented documentary and testimonial evidence on "the creation and performance under the two agreements, out-of-pocket expenses, lost profits, and attorneys' fees."  (Smith Petition to Vacate or Modify Arbitration Award ¶ 9)  On December 28, the arbitrator awarded Positive a total of $379,874, which consisted of (i) $184,000 in lost profits, (ii) $138,000 in expenses incurred by Positive, (iii) $7,874 in legal fees, and (iv) $50,000 for loss of reputation and business.  (Arbitration Award at 2) These figures appear to track the amounts requested by Positive in its "Statement of Facts" submission.  (Ex. B to Qureshi Decl. at 4-5) The arbitrator made the following factual findings:

> [Positive] made powerful efforts to fulfill
> its duties under its agreement with [Smith].
> It made accommodations to [Smith] that were
> above and beyond the terms of the original
> agreement.  Modifications to the original
> agreement were made by [Positive] at the
> behest of [Smith] in an effort to ameliorate
> the breach of the original agreement by
> [Smith].  Further efforts to ameliorate
> damages were taken by [Positive] after
> [Smith] failed to perform [his] duties under
> the terms of the modified agreement. [Smith]
> failed to cooperate with these efforts to
> ameliorate [Smith's] failure to perform under
> the terms of the modified agreement.  Loss to
> [Positive's] income and reputation has

resulted from [Smith's] actions and failure
                    to perform.

(Arbitration Award at 1)

          On February 11, 2005, by his current counsel, Smith

submitted a Notice of Request to Correct and/or Vacate Award to

the ICDR.  (Ex. C to Jacobs Decl.)  He argued that he had not

received proper notice of the arbitration, that the arbitrator

did not have jurisdiction over the matter, and that the award

contained "computational errors and is unconscionable."  (Id.)

On February 23, 2005, the arbitrator denied Smith's request.

(Ex. A to Qureshi Decl.))  Smith filed the instant petition on

May 16, 2005.


                                  II.

          The burden on a party seeking to vacate an arbitration

award is "a formidable one" in light of the "limited review of

arbitration decisions . . . necessary both to effectuate the

parties' agreement to submit their disputes to arbitration and to

avoid costly and protracted litigation about issues the

arbitrators have already decided."  Capgemini U.S. LLC v.

Sorensen, No. 04-7584, 2005 WL 1560482, at *3 (S.D.N.Y. July 1,

2005) (citing cases).

          An arbitration award may be vacated only on the grounds

enumerated in the FAA or if it was arrived at in "manifest

disregard of the law."  Wallace v. Buttar, 378 F.3d 182, 189 (2d

Cir. 2003); <u>Merrill Lynch, Pierce, Fenner & Smith, Inc.</u> v.
<u>Bobker</u>, 808 F.2d 930, 933 (2d Cir. 1986).

III.

Smith argues first that neither he nor Leibowitz -- who
he claims was his lawyer for disputes arising from the January
and May agreements -- was given proper notice of the arbitration.
He contends that any communications between Positive and Ujaama
were insufficient notice because under the May Agreement,
Positive was required to give any notices to Smith at "c/o BME
Recording, 2144 Hills Ave. NW, No. D-2, Atlanta, Georgia 30318."
(May Agreement at Preamble and ¶ 15) However, Ujaama was
designated in the January Agreement to receive notices to Smith.
(January Agreement at Preamble and ¶ 23 ("Agreement made . . . by
and between LIL JON . . . whose address is c/o UJAAMA
ENTERTAINMENT . . . ."))

Smith argues further that Positive "could have given
[him] proper notice through his legal representative, William R.
Leibowitz."  (Smith Reply at 6) Positive claims that it "had no
knowledge of the identity of Smith's attorneys until February 11,
2005," when Smith's current counsel submitted to the ICDR a
Notice of Request to Correct and/or Vacate the Award.  (Positive
Opp'n at 18) In response, Smith points to the June 18, 2004
letter from Leibowitz to Positive, which he contends indicated

that Leibowitz represented Smith.  (Ex. C to Jacobs Decl.) (" . .
. as I hereby reiterate on behalf of the Artist (Smith)"; "On
behalf of TVT and the Artist . . . .")

Smith claims also that Positive sent the arbitration
notice to a defective address by omitting "BME Recording" and BME
Recording's Suite number.  (Ex. B to Jacobs Decl.)  According to
Weiner, only the Suite number was omitted from the mailing
address.  (Weiner Aff. ¶ 5)  Finally, Smith claims that he did
not receive proper notice of the hearing in the form of personal
service, registered mail, or certified mail.  <u>See</u> N.Y. CPLR §
7503(c).

Section 10(a)(3) of the FAA provides in relevant part
that an arbitration award may be vacated "[w]here the arbitrators
were guilty of misconduct in refusing to postpone the hearing,
upon sufficient cause shown, or in refusing to hear evidence
pertinent and material to the controversy; or of any other
misbehavior by which the rights of any party have been
prejudiced," 9 U.S.C. § 10(a)(3), or "[w]here the arbitrators
exceeded their powers, or so imperfectly executed them that a
mutual, final, and definite award upon the subject matter
submitted was not made."  <u>Id.</u> § 10(a)(4).  Although an arbitrator
does not have to follow "the strictures of formal court
proceedings in conducting the arbitration hearing," he "must
nevertheless 'grant the parties a fundamentally fair hearing.'"

<u>Kaplan</u> v. <u>Dunhill, Inc.</u>, No. 96-0258, 1996 WL 640901, at *5

(S.D.N.Y. Nov. 4, 1996) (quoting <u>Bell Aerospace Co. Div. of

Textron, Inc.</u> v. <u>Local 516, UAW</u>, 500 F.2d 921, 923 (2d Cir.

1974)).   A "fundamentally fair hearing" requires that all

parties receive notice of the arbitration.   <u>Id.</u>

> Moreover, AAA rules provide:
>
> Unless the law provides to the contrary, the
> arbitration may proceed in the absence of any
> party or representative who, after due
> notice, fails to be present or fails to
> obtain a postponement.  An award shall not be
> made solely on the default of a party.  The
> arbitrator shall require the party who is
> present to submit such evidence as the
> arbitrator may require for the making of an
> award.

American Arbitration Association, Commercial Arbitration Rules

and Mediation Procedures R-29.

Smith likens this case to <u>Kaplan</u> and argues that he was

not given proper notice of the arbitration.   In <u>Kaplan</u>, a labor

union commenced an arbitration against Dunhill on behalf of a

fired employee.  First, the Court found that neither Dunhill nor

its counsel was copied on the request for arbitration that the

union sent to the AAA, and that the AAA addressed correspondence

to a title that did not exist at Dunhill.   <u>Id.</u> at *1.  The AAA

also sent a notice of hearing by certified mail to Dunhill's New

York office.   <u>Id.</u>  Dunhill's receptionist signed for the

certified letter and testified at deposition that although she

could not recall exactly how she disposed of the notice after

signing the receipt, she would have put it in Dunhill's internal mail box to be forwarded eventually to Dunhill's President or Payroll Manager. Id. at *2. The letter was found eventually behind Dunhill's internal mailbox next to the receptionist's desk, but only after the arbitration hearing had closed. Id. at *3. Dunhill employees claimed that no one from the union had contacted Dunhill or its counsel about the hearing until after it was over. Id. at *2. The Court vacated the arbitration award in light of this "substantial, undisputed evidence that [Dunhill] did not receive notice of the hearing." Id. at *7.

In this case, however, Smith does not deny that at least one of his agents –- Ujaama -- received correspondence and notices relating to the arbitration. Moreover, Positive claims, and Smith does not deny, that throughout the arbitration proceedings, Gerald Weiner, Positive's counsel, spoke to Isaac on at least six occasions by telephone and exchanged numerous e-mails with him. (Positive Opp'n at 3-4) Isaac assured Weiner that Smith was aware of the arbitration, that related documents and correspondence were being forwarded to Smith, and that Smith would be represented by counsel at the hearing and that attorney would contact Weiner. In an e-mail from Weiner to Isaac and Morris dated August 17, 2004, Weiner asked, "Has an attorney for Jonathan Smith appeared in this matter? Do we know who will be representing him?" (Ex. B to Affirmation of Alan Fraade ("Fraade

Aff."))  According to an e-mail from Weiner to Morris dated September 16, 2004, Weiner "talked to both the AAA and Erskine [Isaac] today.  The AAA had asked me to find out from Erskine if Lil Jon is going [to] hire a lawyer and appear in this action. Erskine says he has told Mitchell over and over they must hire a lawyer and they say they are going to, but so far he doesn't know anything more."  (Ex. A to Fraade Aff.)  It is clear from this correspondence that at least Isaac and Mitchell, both representatives of Smith, were aware of the pending arbitration and knew that Smith needed a lawyer.  That "Ujaama was completely unable to communicate effectively with Smith" (Smith Reply at 5) is irrelevant to whether Smith was given sufficient notice of the arbitration.

New York law, which requires notice by registered mail or personal service, is inapplicable.  The parties expressly agreed in the January Agreement arbitration clause that the AAA's Rules would govern the arbitration.  (January Agreement at 8); see Volt Info. Sci., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ., 489 U.S. 468, 479 (1989) (the parties may specify by contract the rules under which arbitration will be conducted). Rule 39 of the Commercial Arbitration Rules of the AAA provides that "any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration . . . may be served on a party by mail addressed to the party, or its representative

at the last known address or by personal service."  There is no requirement that notices be sent to a party's counsel.  Moreover, "the AAA, the arbitrator, and the parties may also use overnight delivery or electronic facsimile transmission (fax), to give the notices required by these rules."

Regardless, in light of the strong policy favoring arbitration and undisputed proof that Smith had notice of the arbitration, the award will not be disturbed on the ground that a suite number was missing from a mailing address or that a notice was not sent by certified or registered mail.  See, e.g., Merrill Lynch, Pierce, Fenner & Smith v. Lecopulos, 553 F.2d 842, 845 (2d Cir. 1977) ("no unfairness results from giving effect to the notice they actually received"); Marsillo v. Geniton, No. 03-2117, 2004 WL 1207925, at * 5-6 (S.D.N.Y. June 1, 2004) (although it was unclear whether petitioner received all arbitration-related correspondence, award was confirmed where he had actual notice of NASD arbitration proceedings and "his failure to make any inquiries" about other correspondence "suggest that [he] simply chose to ignore the arbitration proceedings"); Gingiss Int'l, Inc. v. Bormet, 58 F.3d 328, 332 (7th Cir. 1995) ("inadequate notice is not one of [the statutory] grounds" for vacating an arbitration award); Bernstein Seawell & Kove v. Bosarge, 813 F.2d 726, 729-30 (5th Cir. 1987) (award confirmed where party had actual notice of arbitration proceedings; "due

process is not violated if the [arbitration] hearing proceeds in the absence of one of the parties when that party's absence is the result of his decision not to attend"); Borop v. Toluca Pacific Sec. Corp., No. 97-4591, 1997 WL 790588, at *2 n.7 (N.D. Ill. Dec. 17, 1997) ("Absent fraudulent or improper conduct, defective notice cannot justify an order vacating an arbitration award under Section 10 of the FAA").

IV.

Next, Smith contends that the arbitrator had no jurisdiction because the May Agreement "specifically eliminated the arbitration provision" in the January Agreement (Smith Brief at 7) and provided that "any dispute arising under [the May Agreement] shall be litigated only before courts within the State of New York." (May Agreement at 6)

The plain language of the May Agreement provides otherwise. Only "[u]pon [Smith] performing all of [his] obligations" under the May Agreement would the January Agreement "be deemed void and superceded [sic] in all respects" by the May Agreement. (May Agreement at 1) Because Smith failed to perform his obligations under the May Agreement, the terms of the January Agreement, including the arbitration provision, were preserved. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983) ("The [FAA] establishes that, as a matter of

federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."); Collins v. Aikman Prods. Co., 58 F.3d 16, 19 (2d Cir. 1995) (matters are arbitrable "'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute'") (quoting Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 250 (2d Cir. 1991)).

V.

Smith contends also that the arbitrator awarded various categories of damages in "manifest disregard" of New York law. Alternatively, Smith argues that the award contains miscalculations and should be modified accordingly. See 9 U.S.C. § 11.[1] "'Manifest disregard of the law' by arbitrators is a

---

[1] The court "may make an order modifying or correcting the award upon the application of any party to the arbitration":

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

judicially-created ground for vacating their arbitration award."
Bobker, 808 F.2d at 933. "In order to advance the goals of
arbitration, courts may vacate awards [under the doctrine] only
for an overt disregard of the law and not merely for an erroneous
interpretation." Folkways Music Publishers, Inc. v. Weiss, 989
F.2d 108, 111 (2d Cir. 1993). "A court must not disturb an award
simply because of an arguable difference of opinion regarding the
meaning or applicability of the laws." W.K. Webster & Co. v. Am.
President Lines, Ltd., 32 F.3d 665, 669 (2d Cir. 1994). Rather,
the arbitrator must have known affirmatively of the governing
legal principle yet refused to apply it or ignored it altogether.
See Bobker, 808 F.2d at 933 ("the term 'disregard' implies that
the arbitrator appreciates the existence of a clearly governing
legal principle but decides to ignore or pay no attention to
it"); see also Siegel v. Titan Indus. Corp., 779 F.2d 891, 892
(2d Cir. 1985). The governing legal principle "must be well
defined, explicit, and clearly applicable." Bobker, 808 F.2d at
934. A legal principle "clearly" governs the resolution of an
issue before the arbitrator if its applicability is "obvious and
capable of being readily and instantly perceived by the average
person qualified to serve as an arbitrator." Id. at 933.

Arbitrators are not required to document their

_____

9 U.S.C. § 11.

reasoning.  See <u>Int'l Bhd. of Elec. Workers, Local 97</u> v. <u>Niagara</u>
<u>Mohawk Power Corp.</u>, 143 F.3d 704, 716 (2d Cir. 1998).
Particularly where the arbitrator provides little reasoning or
none at all, the award must be confirmed if "a ground for the
arbitrator's decision can be inferred from the facts of the
case."  <u>Siegel</u>, 779 F.2d at 894 (citation omitted); <u>see also</u> <u>GMS</u>
<u>Group, LLC</u> v. <u>Benderson</u>, 326 F.3d 75, 78 (2d Cir. 2003).  Put
another way, an arbitration award must be confirmed if there is a
"'barely colorable justification for the outcome reached,'" even
if that justification is based on an error of fact or law.  <u>Banco</u>
<u>de Seguros del Estado</u> v. <u>Mut. Marine Office, Inc.</u>, 344 F.3d 255,
260 (2d Cir. 2003) (quoting <u>Landy Michaels Realty Corp.</u> v. <u>Local</u>
<u>32B-32J, Serv. Employees Int'l Union, AFL-CIO</u>, 954 F.2d 794, 797
(2d Cir. 1992)).

A.   Lost profits

        The lost profits component of the award -- $184,000 --
appears to be based on Positive's claim that it would have made
approximately $130,000 in profits "had [the March shows] gone
forward without incident" plus $54,000 in losses from the
replacement shows.  (Ex. B to Qureshi Decl. at 4)  Smith contends
that the award was in manifest disregard of New York law because
(i) lost profits damages were not contemplated by the parties at
the time of contract; (ii) the arbitrator held Smith responsible
for Positive's "aggravation of its own injuries in its botched

17

mitigation attempt" by booking replacement performances; (iii) the arbitrator awarded Positive lost profits based on a July 3, 2004 show that was "outside the scope of the agreement between the parties"; and (iv) the amount is overly speculative.  (Smith Reply at 12)

New York law requires that "a plaintiff prove with a reasonable degree of certainty that any claimed loss of profits was caused by the defendant's breach."  Bausch & Lomb, Inc. v. Bressler, 977 F.2d 720, 728 (2d Cir. 1992).  In other words, damages from lost profits "'may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.'"  Care Travel Co. v. Pan American World Airways, Inc., 944 F.2d 983, 994 (2d Cir. 1991) (quoting Kenford Co. v. County of Erie, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132 (1986) (per curiam)).  However, the amount of lost profits, as with all damages, need not be demonstrated with "scientific rigor."  Lexington Prods. Ltd. v. B.D. Communications, Inc., 677 F.2d 251, 253 (2d Cir. 1982); see also S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 852 (2d Cir. 1987).

In Lexington Products, the Second Circuit noted:

> When it is certain that damages have been
> caused by a breach of contract, and the only
> uncertainty is as to their amount, there can
> rarely be any good reason for refusing, on
> account of such uncertainty, any damages
> whatever for the breach.  A person violating

18

> his contract should not be permitted entirely
> to escape liability because the amount of the
> damage which he had caused is uncertain.

677 F.2d at 253 (quoting Randall-Smith, Inc. v. 43rd St. Estates
Corp., 17 N.Y.2d 99, 106, 268 N.Y.S.2d 306, 312 (1966)). Thus,
when the existence of damages is certain but the amount itself is
uncertain, "plaintiff will not be denied a recovery of
substantial damages." Contemporary Mission, Inc. v. Famous Music
Corp., 557 F.2d 918, 926 (2d Cir. 1977); see also Lexington
Prods., 677 F.2d at 253 ("where a wrong has been done, the courts
will endeavor to make a reasonable estimate of damages") (citing
Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264-66 (1946)).
Smith does not so much dispute that Positive suffered damages
from his breach as challenge the damage amounts set by the
arbitrator.

In addition, liability for lost profits damages must
have been contemplated by the parties at the time of contract.
See Ashland Mgmt. v. Janien, 82 N.Y.2d 395, 403, 604 N.Y.S.2d
912, 915 (1993). "The party breaching the contract is liable for
those risks foreseen or which should have been foreseen at the
time the contract was made." Id. Where the contract is silent
on the subject, the court must take a "common sense" approach,
and determine what the parties intended by considering "the
nature, purpose and particular circumstances of the contract
known by the parties . . . as well as what liability the

19

defendant fairly may be supposed to have assumed consciously."
<u>Kenford Co.</u> v. <u>County of Erie</u>, 73 N.Y.2d 312, 319, 540 N.Y.S.2d
1, 4 (1989) (internal quotation marks and citation omitted).

Neither the January Agreement nor the May Agreement
mentions liability for lost profits.  However, Positive claims
that by the time the parties entered the May Agreement, Smith was
aware of Positive's investment in the performances, as well as
the volume of advance ticket sales for the cancelled March shows.
On March 5, 2004, shortly before Smith cancelled the March shows,
Weiner warned Isaac that if Smith did not appear "as scheduled,
there will be immediate litigation" and that Positive would "hold
[Smith] personally responsible" for Positive's losses.  (Ex. D to
Fraade Aff.)  Weiner detailed Positive's investment in the shows,
that Positive would "lose the potential profit" from the shows,
and that Positive would suffer "significant and real damage to
[its] reputation within the music industry" if the shows did not
take place.  (<u>Id.</u>)  The arbitrator recognized that Smith "failed
to cooperate with [Positive's] efforts to ameliorate [Smith's]
failure to perform under the terms of the modified agreement."
(Arbitration Award at 1) Smith appears to argue that although the
above communications might prove that the parties contemplated
lost profits damages by the time they entered into the May
Agreement, they do not bear on the parties' intent as to
liability for the March shows.  The text of the e-mail need not

be repeated; Weiner clearly referred to the March performances, which were the subject of the January Agreement. Smith's awareness that he might be liable for lost profits from the March shows "can be inferred from the facts of [this] case." <u>Siegel</u>, 779 F.2d at 894; <u>see also</u> <u>Kenford</u>, 73 N.Y.2d at 320.

Second, Smith claims that it should not be held liable for Positive's "botched" efforts to mitigate its losses by booking "Trina" as a replacement. Positive responds that the $54,000 in losses from the "Trina" shows were less than what it would have incurred had no replacement act been booked. Expenses for the replacement shows totaled 6,489,216 yen, or $62,886. (Ex. M to Jacobs Decl.) Those shows generated ticket sales of 832,000 yen, or $8,062. (<u>Id.</u>) Approximately 574,000 yen, or $5,562 of those sales appear to have come from exchanges by holders of tickets to the cancelled Lil Jon performances. (<u>Id.</u>)

Under New York law, an "injured party will be allowed to recover the expenses of a proper effort [to mitigate damages] even though it proves unsuccessful." <u>Baker</u> v. <u>Dorfman</u>, 239 F.3d 415, 427 (2d Cir. 2000) (quoting <u>Den Norske Ameriekalinje Actiesselskabet</u> v. <u>Sun Printing & Publ'g Ass'n</u>, 226 N.Y. 1, 122 N.E. 463, 465 (N.Y. 1919)); <u>see also</u> <u>Gordon Co.</u> v. <u>Ross</u>, 84 F.3d 542, 546-67 (2d Cir. 1996). Such expenses include those reasonably incurred by the injured party that would not have been incurred had there been no breach of contract. Smith does not

explain how Positive's mitigation efforts, although perhaps "botched," were unreasonable.  Regardless, "where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen.  The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter."  <u>Sunpride Ltd.</u> v. <u>Mediterranean Shipping Co.</u>, No. 01-3493, 2003 WL 22682268, at *9 (S.D.N.Y. Nov. 12, 2003) (quoting <u>In re Kellett Aircraft Corp.</u>, 186 F.2d 197, 198-199 (3d Cir. 1950)).

        In a related argument, Smith contends that the award of $184,000 is "double recovery" in manifest disregard of the law because the May Agreement constituted an executory accord under New York law.  A party claiming breach of an executory accord can claim damages either for breach of the original agreement or for breach of the accord, but not for both.  <u>See</u> N.Y. Gen. Oblig. L. § 15-501(3) ("if an executory accord is not performed according to its terms by one party, the other party shall be entitled either to assert his rights under the claim, cause of action, contract, [or] obligation . . . which is the subject of the accord, or to assert his right under the accord"); <u>see also</u>

Abou-Khadra v. Mahshie, 4 F.3d 1071, 1078-79 (2d Cir. 1993).

The arbitrator provided a twofold interpretation of the
May Agreement.  First, it was "a modification" of the January
Agreement.  Second, it was part of Positive's attempt to mitigate
damages arising from Smith's breach of the January Agreement.  In
the arbitrator's words, "[m]odifications to the original
agreement were made by [Positive] at the behest of [Smith] in an
effort to ameliorate the breach of the original agreement by
[Smith]."  (Award at 1)  Once it was clear that Smith would not
"cooperate" with that first attempt to mitigate damages, Positive
engaged in "[f]urther efforts to ameliorate damages" by booking
Trina on short notice.  (Id.)  Even assuming that the May
Agreement is an executory accord, the arbitrator's failure to
identify it as such is a mere "failure . . . to understand the
law."  Absent proof that the arbitrator was aware of New York law
governing executory accords but flouted it, such an error does
not satisfy the manifest disregard standard.  Willemijn
Houdstermaatschapij, BV v. Standard Microsys. Corp., 103 F.3d 9,
13 (2d Cir. 1997).  Regardless, the award of lost profits damages
was not "double recovery" or in manifest disregard of New York
law in light of the arbitrator's at least "barely colorable" view
of the May Agreement was part of Positive's attempt to mitigate
damages arising from Smith's breach of the January Agreement.
Bancos de Seguros del Estado, 344 F.3d at 260.

23

Third, Smith argues that the claimed $54,000 in losses from the "Trina" shows -- assuming that it is part of the $184,000 in lost profits awarded -- should be vacated because it included losses from a July 3, 2004 show that "was outside the scope of the parties' agreement."  Under both the January and May Agreements, Smith agreed to perform three shows.  Upon Smith's cancellation, Trina was booked to perform two shows.  Hence, it was reasonable for the arbitrator to focus on the number of performances instead of their dates, and conclude that booking Trina for two performances was a proper attempt by Positive to mitigate damages arising from Smith's failure to perform three shows.

Finally, Smith assumes that the award includes the $130,000 claimed by Positive as lost profits from the March shows, and argues that that figure grossly overstates lost profits and is otherwise speculative.  He calculates the amount as follows: for three shows in venues with maximum capacities of 1,300, advance tickets were sold at 4,000 to 5,500 yen per ticket (see Ex. U to Qureshi Decl. (show advertisement listing ticket prices)).[2]  Accordingly, Positive's maximum gross receipts total 19,500,000 yen or approximately $188,974.50.  (See Ex. L to

---

[2]    The advertisement for the March 12 and 13 performances lists ticket prices at 5,500 yen in advance and 6,500 yen at the door.  For the March 14 performance, tickets were 4,000 yen in advance and 5,000 yen at the door.

Jacobs Decl. (according to the yen-U.S. dollar exchange rate as of December 2004))  After subtracting Smith's fee of $75,000 (January Agreement at 1)[3] and half of Positive's claimed expenses of $138,000, Smith concludes that Positive's maximum possible profit was $44,974.50.

Positive does not respond to Smith's calculation with any precision, but instead relies on proof of ticket sales from the cancelled performances and "for comparison," proof of ticket sales from the Trina shows.  Indeed, neither party has offered a disciplined or even a useful analysis of the record.  Instead, the court has been compelled to navigate the clutter of underlying documents on its own.

Smith's computation fails to account for other possible elements of a lost profits claim.  The court's calculation is as follows: Positive's advance ticket sales records for the March shows list 476 tickets sold at 5,500 yen each for the March 12 performance, 819 tickets at 5,500 yen each for March 13, and 371 tickets at 4,000 yen each for March 14.  (Ex. S to Qureshi Decl.) The remaining tickets were to be sold at the door: 824 tickets at 6,500 yen each on March 12, 481 tickets at 6,500 yen each on March 13, and 929 tickets at 5,000 yen each on March 15. Assuming sell-outs on all three dates, ticket sales would have

_____

[3]     Smith's calculation of his fee for the shows appears to include a guaranteed $70,000 as well as a $5,000 "bonus" if the shows sold out.

totaled 21,734,000 yen, or approximately $210,624.  In addition

to ticket sales, Positive would have earned profits from its 20

percent cut of "all merchandising sales at each venue." (January

Agreement ¶ 15)

It is possible also that the arbitrator incorporated

other loss figures that Positive attributed to Smith's breach --

i.e., its "loss in the 2004 fiscal year of approximately $300,000

after having a profit of approximately $115,000 in 2003 and

$200,000 in 2002" and the "dramatic" drop in ticket sales for

other shows produced by Positive after Smith's June/July shows

were cancelled.  (Ex. B to Qureshi Decl. at 5); see, e.g., Aniero

Concrete Co., Inc. v. New York City Constr. Auth., 308 F. Supp.2d

164, 207 (S.D.N.Y. 2003) ("An established business often is in a

good position to offer evidence of past experience as a

reasonable basis from which a jury may determine lost profits

with the requisite degree of certainty.").

Moreover, it can be inferred from Positive's balance

sheet and the arbitration award that the arbitrator subtracted

considerably less than 50 percent of the $138,000 in expenses

listed on Positive's balance sheet.  Most of the expenses

enumerated on the balance sheet (Ex. K to Jacobs Decl.) are

"cancel charges," promotion and overhead costs, and other

expenses incurred as a result of cancelling the March and

June/July performances, which, at least in the arbitrator's view,

are mitigation damages.

A cynic would view the arbitrator's award of lost profits as a simple rubber-stamping of Positive's claim of $130,000 in lost profits from the March shows and $54,000 in losses from the replacement shows.  However, the court's standard of review is far more forgiving, and where, as here, it happens that the arbitrator's decision has as at least a "barely colorable justification" in the record, the award must be confirmed.  <u>Bancos de Seguros del Estado</u>, 344 F.3d at 260; <u>Duferco Int'l Steel Trading</u> v. <u>T. Klaveness Shipping A/S</u>, 333 F.3d 383, 390 (2d Cir. 2003) ("Even where explanation for an award is deficient or non-existent, we will confirm it if a justifiable ground for the decision can be inferred from the facts of the case.").

B.   Expenses

In awarding Positive $138,000 in expenses, there is little question that the arbitrator relied on Positive's balance sheet, which provides a total of 14,222,088 yen, or approximately $137,824 in expenses for both the March and June/July Lil Jon shows.  (Ex. K to Jacobs Decl.)  Smith has three objections to this portion of the award.

First, he argues that fixed costs "are clearly not recoverable as damages" (Smith Mem. of Law at 13) and that the inclusion of office rent and pay to Positive's staff for January,

February, March, and June 2004 "was an evident miscalculation."
(Smith Reply at 15)  Positive responds that these expenses "were
a direct result of production and promotions for Smith's [March]
performances" from January through March, 2004, and that it
incurred even more such expenses through June after Smith
cancelled those performances.

        Smith does not cite a legal rule, let alone a clear and
established one, barring the inclusion of fixed costs in an award
of expenses.  Nor can one be gleaned from a review of the
caselaw.  See, e.g., Hamil Am., Inc. v. GFI, 193 F.3d 92, 104-05
(2d Cir. 1999) (in copyright infringement action, whether
overhead expenses are deductible from gross revenues depended on
"nexus" between those expenses and production of infringing
product); Adams v. Lindblad Travel, Inc., 730 F.2d 89, 92-93 (2d
Cir. 1984) (noting that fixed costs should not be included in
plaintiff's damages when plaintiff is an ongoing business whose
fixed costs are not affected by defendant's breach of contract);
see also Deiulemar Compagnia Di Navigazione, S.p.A. v. Transocean
Coal Co., Inc., No. 03-2038, 2004 WL 2721072, at *2 (S.D.N.Y.
Nov. 30, 2004) (summarizing disagreement over whether caselaw
barred deduction of fixed expenses from calculation of claimant's
damages).  Moreover, Positive fails to demonstrate that these
overhead expenses were not incurred as part of Positive's
preparation and investment in the Lil Jon Shows.

Second, Smith contends that "PA and Lighting" expenses for the July 2 and 3 shows were double counted. Smith misreads Positive's balance sheets. The balance sheet for the cancelled Lil Jon shows lists a "PA and Lighting Cancel Charge" for the March 12 and 13 shows in the amount of 1,054,000 yen. (Ex. K to Jacobs Decl.) These amounts were penalties Positive incurred for cancelling "PA and Lighting" services for those scheduled shows. The balance sheet for the "Trina" shows lists "PA Lighting" expenses of 194,250 yen for the July 2 show and 164,850 yen for the July 3 show. (Ex. M to Jacobs Decl.) These charges were for services actually rendered by the "PA and Lighting" vendors hired for the "Trina" shows. The "PA and Lighting" figures from the two balance sheets denote different types of charges for different shows; the arbitrator did not "double count."

Third, Smith argues that a 527,000 yen "PA & Lighting Cancel Charge" for a July 3 show is outside the scope of the parties' agreement. (Ex. K to Jacobs Decl.) To reiterate, the arbitrator could have deemed more relevant the number of shows that Smith agreed to perform rather than the dates of those shows. If so, it can be inferred from the balance sheet that Positive was penalized for cancelling "PA and Lighting" services for one of the three Lil Jon shows scheduled for late June and early July. It is undisputed that Positive had to cancel the June-July Lil Jon shows; the balance sheet reflects penalties

Positive incurred for at least two of those shows, specifically "7/2 and 7/3." That Positive may have mistakenly misdated one of those charges is not the kind of error that warrants modification of the award. See B.V.D. Licensing Corp. v. Maro Hosiery Corp., No. 88-2459, 1990 WL 200648, at *3 (S.D.N.Y. Dec. 4, 1990).

C.   Reputation Damages

Damages to reputation generally are not recoverable in a breach of contract action under New York law. See, e.g., Karetsos v. Cheung, 670 F. Supp. 111, 115 (S.D.N.Y. 1987) (precluding recovery for damage to plaintiff's reputation as a result of the breach); MacArthur Constr. Corp. v. Coleman, 91 A.D.2d 906, 457 N.Y.S.2d 530, 531 (1st Dep't 1983) (damage claim in breach of contract action for injury to plaintiff's reputation in the industry is not actionable); Dember Constr. Corp. v. Staten Island Mall, 56 A.D.2d 768, 392 N.Y.S.2d 299 (1st Dep't 1977) (claim seeking damages to plaintiff's reputation arising out of breach of contract is not actionable). They are available only in exceptional cases when the plaintiff proves "specific business opportunities lost as a result of its diminished reputation"; vague assertions will not suffice. I.R.V. Merch. Corp. v. Jay Ward Prods., Inc., 856 F. Supp. 168, 175 (S.D.N.Y. 1994); Karetsos, 670 F. Supp. at 115. "Absent specific proof, damages for loss of reputation are too speculative to be recovered under contract law." Saxton Communication Group, Ltd.

v. <u>Valassis Inserts, Inc.</u>, No. 93-388, 1995 WL 679256, at *2
(S.D.N.Y. Nov. 15, 1995).

The arbitrator found that "[l]oss to [Positive's]
income and reputation has resulted from [Smith's] actions and
failure to perform."  (Arbitration Award at 1) Positive submitted
a notice from a director of Yokohama Bay Hall (the venue
scheduled for the March 12, March 13, and July 2 performances)
discontinuing their business relationship because of "the amount
of losses caused" by the cancellation of the performances.  (Ex.
G to Qureshi Decl.)  MTV Japan, which helped publicize the
performances, notified Positive that it "would like to negotiate
. . . the payment of the fees of the performance announcement and
advertisement and cancellation announcement that [MTV Japan]
conducted through [its] broadcasting media."  (Ex. H to Qureshi
Decl.)  It stated that the cancelled performances resulted in a
"substantial amount of losses" to MTV Japan as well as "a great
loss of [MTV Japan's] reputation among [its] broadcasting
customer and audiences."  (<u>Id.</u>)  Another broadcast advertiser, TV
Kanagawa, sent Positive a similar notice.  (Ex. I to Qureshi
Decl.)

Fellows Company, a vendor hired to prepare sound,
lighting, and the stage, demanded compensation for the
preparations it had already made for the July performances.  (Ex.
J to Qureshi Decl.)  It noted that the cancelled March and July

performances "affect [its] trustworthiness," that its losses from the cancelled performances were "so great" that they "considered . . . suing" Positive. (Id.) M.O.P. Company, a promoter hired by Positive, also cited considerable losses resulting from the cancelled July performances and demanded payment of "losses and damages." (Ex. K to Qureshi Decl.) Finally, FM Later Wane, a broadcast advertiser, complained of the cancelled performances and told Positive that it "would have to reconsider [its] way of doing business" with Positive. (Ex. L to Qureshi Decl.)

These notices are proof of specific harm arising from the loss of reputation. Because they constitute at least "a barely colorable justification for the outcome reached" by the arbitrator, the award of damages to reputation will not be disturbed. Bancos de Seguros del Estado, 344 F.3d at 260.

D. Legal fees

Last, Smith contends that the arbitrator's award of attorneys' fees to Positive was in manifest disregard of the law because the January Agreement provides that it "shall be construed in accordance with the laws of the State of New York" (January Agreement at 8), under which attorneys' fees may not be awarded unless specifically provided for in the contract. See N.Y. CPLR § 7513. He asserts that the award of attorneys' fees cannot be based on the January Agreement because there was no provision authorizing such an award. On the other hand,

according to Smith, the award cannot be based on the May
Agreement because along with the clause providing for attorneys'
fees to the prevailing party, that agreement designated forum in
the New York courts, stripping the arbitrator of any power to
award attorneys' fees.

Even in the face of New York's prohibition, the Second
Circuit has held that even if there is a choice of law clause
selecting New York law, the parties may arbitrate the issue of
attorneys' fees.  See PaineWebber Inc. v. Bybyk, 81 F.3d 1193,
1202 (2d Cir. 1996) ("a choice of law provision will not be
construed to impose substantive restrictions on the parties'
rights under the Federal Arbitration Act, including the right to
arbitrate claims for attorneys' fees"); cf. Mastrobuono v.
Shearson Lehman Hutton, Inc., 514 U.S. 52, 59-60 (1995) (even
with a New York choice of law clause, an arbitrator may award
punitive damages, although New York law does not allow
arbitrators to award such damages).

Moreover, the arbitrator did not act in manifest
disregard of New York law by carrying forward the arbitration
agreement from the January Agreement while awarding attorneys'
fees to Positive under the May Agreement.  To reiterate, the May
Agreement provides that "[u]pon [Smith] performing all of [his]
obligations hereunder the [January] Agreement shall be deemed
void and superceded [sic] in all respects by this agreement."

33

(May Agreement at 1) Because Smith's failure to perform left the
January Agreement intact, it appears that the arbitrator
concluded either that the January Agreement's silence on
attorneys' fees did not preclude the award of attorneys' fees, or
that the May Agreement added an attorneys' fee provision -- in
lieu of the January Agreement's silence -- and carried over the
January Agreement's arbitration clause because it had not been
superseded by the May Agreement's forum clause.  See Marine
Transport Lines v. Int'l Org. of Masters, Mates & Pilots, 878
F.2d 41, 46 (2d Cir. 1989) (modification of contract may add new
terms, but the terms of the old contract "are still to be
followed so far as not changed or as inconsistent with the new
terms").

        In any event, Smith's argument is no more than a
dispute about the reasonable interpretation of the two
agreements.  The Second Circuit has stated that "[i]nterpretation
of [] contract terms is within the province of the arbitrator and
will not be overruled simply because we disagree with that
interpretation."  Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R"
Us, Inc., 126 F.3d 15, 25 (2d Cir. 1997) (citing United
Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 599
(1960)); In re I/S Stavborg v. Nat'l Metal Converters, Inc., 500
F.2d 424, 432 (2d Cir. 1974) ("whatever arbitrators' mistakes of
law may be corrected, simple misinterpretations of contracts do

not appear one of them").

        *                 *                 *

For the above reasons, Smith's petition is denied and Positive's cross-petition granted.

SO ORDERED:

Dated:     New York, New York
              August 31, 2005

Michael B. Mukasey
U.S. District Judge